```
                    FILED
                  JAN 27 2006
        UNITED STATES BANKRUPTCY COURT
        EASTERN DISTRICT OF CALIFORNIA
```

# UNITED STATES BANKRUPTCY COURT
## Eastern District of California
### Fresno Division

| | |
|---|---|
| In re<br><br>Sierra Custom Homes, a General Partnership,<br><br>    Debtor. | Case No. 03-10742-B-7 |
| Quentin Cedar and Gwenlee Cedar,<br><br>    Claimants,<br><br>    v.<br><br>James E. Salven, Chapter 7 Trustee, for the Estate of Sierra Custom Homes, a General Partnership,<br><br>    Respondent. | Claim No. 2 |
| James E. Salven, Chapter 7 Trustee, for the Estate of Sierra Custom Homes, a General Partnership,<br><br>    Plaintiff,<br><br>    v.<br><br>Quentin Cedar and Gwenlee Cedar,<br><br>    Defendants. | Adv. No. 04-1379-D |

## MEMORANDUM OF DECISION

The pictures tell it well. This is a case of glaringly shoddy work by a home building contractor. Over the course of five days in a consolidated trial the court heard and admitted evidence with respect to an objection to a claim filed in the debtor's bankruptcy proceeding by Quentin Cedar and Gwenlee Cedar ("the Cedars") and an adversary proceeding in which plaintiff Chapter 7 Trustee, James E. Salven ("the trustee"), seeks payment from the Cedars for work done by the debtor, Sierra Custom Homes ("Sierra"), in constructing a residence for the Cedars. The

U:\bdof\bd\Sierra Custom Homes Memo of Decision 5

Cedars' claim seeks to recover damages for work that was defectively done or not done.[1]

Pursuant to the terms of the contract the residence was to have been completed by February of 2000. Although the residence appeared substantially completed by then, work was still in progress in July of 2000 when a state court complaint filed by the Cedars against Sierra triggered an impasse between the parties marked by attempts on behalf of each side to demand concessions beyond the terms of the written contract. The Cedars ultimately completed the construction of the residence to a point where they could occupy it and had the necessary repairs done without further efforts by Sierra. Some of the repairs have yet to be done and certain deficiencies will not be corrected because it is simply not feasible to do so.

The construction contract contained an express provision that "All material is guaranteed to be as specified. The above listed work will be performed in accordance with the drawings and specifications submitted for above work and to be completed in a substantial workmanlike manner for the sum of $435,646.00." As set forth below, the Cedars presented overwhelming evidence to prove that the residence was neither constructed in accordance with the drawings and specifications nor constructed in a substantial workmanlike manner. While there are too many construction defects with the Cedars' house to expound in this decision, the major defects, which cause this court to find that Sierra materially breached the contract, are noted below.[2] This summary is by no means an exhaustive description of all of the defects that were presented at trial.

---

[1] At the close of trial the court gave each of the parties the opportunity to submit opening and reply briefs in which the evidence presented in support of their respective positions could be discussed. The briefs from both sides were of little help and if anything made the court's review more difficult. The Cedars' initial brief attached a pre-trial brief–with a confusing updated signature page–which addressed matters not presented at the trial and made reference to attached exhibits marked alphabetically which in fact were not attached. The trustee's briefs attempted to achieve with hyperbole what could not be accomplished with a realistic discussion of the evidence presented. The trustee also attempted to augment the trial record by attaching as an exhibit to his reply brief and using in his argument a seven page document entitled "SETTLEMENT AGREEMENT AND RELEASE." In addition, the trustee in footnote 1 also attempted to augment the trial record by injecting a historical record of various lawsuits filed by the Cedars in an effort to show there was a grand design on the part of the Cedars to minimize the cost of the new residence.

[2] The trustee has argued that there were no legitimate problems with the Cedars' house that could not be cured by a "simple punch-list." This argument is simply without merit and is completely at odds with the testimony and evidence presented at trial.

U:\bdof\bd\Sierra Custom Homes  Memo of Decision  5                    2

A significant amount of testimony was presented at trial regarding the defects in the roof of the house, which included the framing, the felt installation, and the tile installation. The construction plans expressly called for "all roofs to be trussed." Gwenlee Cedar testified that Sierra used a combination of stick framing and truss framing. The Cedars' expert, Gaylord Ransom, who thoroughly inspected the roof, testified that Sierra had used what is known as conventional framing. Ransom concluded that the framing was not in compliance with the construction plans, which called for prefabricated roof trusses. Ransom also testified that in his professional opinion the roof did not meet code standards and that the quality of the roof framing was substantially below industry standards for several reasons. First, the size and grade of the rafters were not sufficient to handle the loads required for a tile roof. Second, several of the hips had no framing connections, i.e., no nails at all. Third, there was a significant amount of conventional framing when truss framing was called for in the plans. Fourth, where Sierra did use trusses, several of the trusses had been cut up thereby destroying their integrity. Ransom's testimony clearly indicates that the roof construction was not up to code standards and was not constructed in a substantial workmanlike manner. The trustee's expert, Fred Biglione, testified that the roof could be fixed for about a thousand dollars. Biglione's testimony cannot be given any weight as he did not crawl into the attic space to look at the roof and he did little more than a cursory inspection of the roof. In fact, Biglione testified that he did not even know that the trusses had been cut.

       The construction plans called for a red clay tile roof. The tile itself does not keep the house waterproof. The membrane system, which includes roof roll and building felt, provides the necessary waterproofing for the type of tile roof that the construction plans called for. The construction plans clearly provide for a "(2) piece clay tile system red blend mix with mortar (random) over 90# roll roof over 30# building felt." Troy Brooks, the Cedars' roofing consultant and expert, testified that initially only 30# felt was installed under the tile. The county did not approve this because it was not in compliance with the plans. Sierra attempted to cure this defect by removing the tile and installing 86# felt over the old 30# felt, which now had thousands of

holes in it from removing the tile. Sierra did not properly fix the membrane system according to the plan specifications because 86# felt was used instead of 90# felt and the old hole-filled 30# felt was not replaced with new waterproof 30# felt. Moreover, the actual roof tiles had serious defects with respect to the Uniform Building Code, the requirements of the tile manufacturer, and industry standards. The tiles were improperly spaced and did not provide the proper head lap so that the tiles shed water properly. Rake tiles were not installed in the appropriate manner. Flashings were penetrated with nails, which breaches the water integrity of these systems. Mortar beds, which provide protection against wind-blown rain, were not present in the appropriate places.

The Cedars presented uncontroverted evidence that the french doors leaked because of improper installation. Sierra failed to install sheet metal pan flashing under the french door frames, and the failure to do so caused significant water intrusion into the interior of the house. Sheet metal pan flashing is designed to keep water from entering the interior of the house. The french doors, which come in a frame, are installed within the pan flashing. The Cedars' expert, John Kelleher, testified that Sierra failed to install the sheet metal pan flashing and this was the cause of water intrusion. Kelleher further testified that the french doors would not have leaked had Sierra installed sheet metal pan flashing and that installing such flashing will cure the water intrusion problems. Moreover, the only way to install the pan flashing is to remove each door frame from the particular wall it is installed into. To do so will affect the interior drywall, the exterior stucco, the waterproofing integrity of the stucco, and it is very difficult to match the texture and color of the stucco as it should have initially been. Kelleher estimated that it would cost at least $40,000 to remove the french doors, install pan flashing, reinstall the french doors, and fix the interior drywall and exterior stucco. Additionally, the court finds that there is no credible evidence that the Cedars instructed Sierra not to install the sheet metal pan flashing.[3]

---

[3] Gwenlee Cedar specifically testified that she "never instructed anyone to not install flashing pans under the doors." Richard Byrd testified that the Cedars specifically instructed Larry Byrd not to install the sheet metal pan flashing because it would show in the interior of the house and would be ugly. The court finds that Richard Byrd's testimony is unconvincing for two reasons. First, the Cedars expert John Kelleher testified that there are ways to disguise the

Gwenlee Cedar testified that there was water intrusion in the south downstairs bedroom. According to Gwenlee Cedar, the reason for this water intrusion was that there was a gap between the foundation and wall plate at the base of the wall. In fact, when Gwenlee Cedar was in this bedroom she could see daylight at the bottom of the wall. Gwenlee Cedar discussed this gap with the Byrds, who said they would take care of the problem but never did.

The construction plans called for batten insulation. Batten insulation is insulation that comes in rolls; this type of insulation is more controllable than blown-in insulation. Blown-in insulation is loose insulation that is installed by using a blower and it randomly fills in space. Sierra used blown-in insulation rather than the batten insulation called for by the plans. The blown-in insulation has caused electrical problems with some of the recessed can lighting. The recessed lighting will intermittently shut off due to overheating. The reason for the overheating is that Sierra failed to install a barrier space between the recessed canned lighting and the blown-in insulation, a problem that wouldn't exist if batten insulation was used.

The Cedars also presented evidence of defective electrical work in the kitchen. Sierra ran the refrigerator, double ovens, the microwave, the kitchen hood, the garbage disposal, and all electrical sockets on one circuit. One circuit was not sufficient to run all of these electrical appliances. The Cedars had the electrical circuits in the kitchen properly rewired so the appliances would run properly.

The Cedars had several areas of the house, including the staircase, where the construction plans called for wrought iron. Sierra did not use solid wrought iron but instead used a hollow steel that was larger than what the plans called for. Moreover, the railing was not constructed according to the plans and Larry Byrd told the Cedars that, "We know it's not what was specified in the plans, but we are going to try to make it work."

A few other items are also worth mentioning despite the fact Sierra did rectify these

---

pan flashing. Second, and more importantly, Kelleher testified that Larry Byrd told him not to alarm the Cedars by telling them about problems with the doors and lack of pan flashing. It makes little sense to conceal the door problems and lack of pan flashing from the Cedars, if the Cedars had in fact told Larry Byrd not to install the pan flashing.

problems. First, the pool shed completely collapsed after being framed, felted, and had tile on it. Second, the front porch columns were not flush with the concrete porch but rather hung over the porch by about four or five inches, to which Larry Byrd responded, "that's the new look." The reason that the columns hung over was that the concrete subcontractor did not properly set up the forms according to the construction plans and neither the concrete subcontractor nor Rick Byrd or Larry Byrd caught the mistake.

While the court could go on with other defects, the fact is that Sierra's work was substandard and woefully short of the contractual requirement of "substantial workmanlike manner" and that to a large degree it substituted inferior materials.

The trustee's theory of recovery in this case largely relies on the doctrine of quantum meruit. The court will note here that the trustee will not recover under a breach of contract theory or a quantum meruit theory. The court is addressing the trustee's quantum meruit theory not only because he has heavily relied on it, but also because he fails to understand how recovery is determined. The trustee has also relied on other theories that are also discussed below.

It is the trustee's position that because the Cedars filed a lawsuit in July of 2000, Sierra was permitted to rescind the construction contract and sue for damages under a quantum meruit theory.[4] The trustee further argues that under a quantum meruit theory the Cedars owe the estate $449,758.35[5] as of July 25, 2005. The trustee relies on *Boomer v. Muir*, 24 P.2d 570 (Cal. Dist. Ct. App. 1933) for the proposition that he (as the trustee of Sierra's bankruptcy estate) can recover the reasonable value of the "benefit conferred" upon the Cedars without the contract

---

[4] A party to a contract that is in default may not unilaterally rescind a contract. *See Integrated, Inc. v. Alec Fergusson Elec. Contractor*, 250 Cal. App. 2d 287, 298 (Ct. App. 1967) (stating the rule that "[o]ne who is himself in default in the performance of a dependent or concurrent obligation or where his default is so related to the obligation in which the other has failed that it affects the performance thereof or the duty of the other to perform may not unilaterally rescind because of the other's breach."). As set forth in this decision, there is more than ample evidence that as of July 2000 Sierra was in material breach of the construction contract.

[5] The trustee arrived at this figure through the following calculation. $640,000 (appraisal value in 2000) minus $361,270 (amount Cedars have paid to Sierra) for a difference of $278,730, plus $171,028.35 (simple interest at 10% from 7/18/00 through 7/25/05) for a total due of $449,758.35.

price being a "cap" on damages.[6]

The term quantum meruit is a Latin term that means "as much as he has deserved." *Black's Law Dictionary* 1255 (7th ed. 1999). Quantum meruit "is based on the idea that someone should get paid for beneficial goods or services which he or she bestows on another." *Maglica v. Maglica*, 66 Cal. App. 4th 442, 445-46 (Ct. App. 1998). "The measure of recovery in quantum meruit is the reasonable value of the services rendered, provided they were of direct benefit to the defendant." *Palmer v. Gregg*, 422 P.2d 985, 986 (Cal. 1967). The requirement that there be a benefit from services has confused the trustee in this case as it did the plaintiff in the *Maglica* case. As the California Court of Appeal clearly pointed out, "[i]t is one thing to require that the defendant be benefited by services [or goods], it is quite another to measure the reasonable value of those services by the value by which the defendant was 'benefited' as a result of them." *Maglica*, 66 Cal. App. 4th at 450. A contract price and reasonable value of services are distinct items and sometimes one may exceed the other. *Id*. Permitting a quantum meruit recovery based on the "resulting benefit" of goods or services rather than the reasonable value of such goods or services allows an aggrieved party the best of contractual and quasi-contractual recovery. *Id*. Resulting benefit is an open ended standard where the rendering of a particular service can have a disproportionate value to what it would cost on the open market. *Id*.

The trustee's understanding of quantum meruit is misplaced. The cases that the trustee has cited do not stand for the proposition urged by the trustee that Sierra can recover any additional amounts above the value of what it actually provided to the Cedars.[7] The construction contract contemplated that Sierra would supply its services to build the house and to provide the

---

[6] The parties have extensively argued over whether *Boomer* is good law. Regardless of whether *Boomer* itself is good law, the proposition that the trustee cites *Boomer* for is found in other cases. For example, the California Court of Appeal noted that "[i]t is well settled that one who is wrongfully discharged and prevented from further performance of his contract may elect as a general rule to treat the contract as rescinded, may sue upon a quantum meruit as if the . . . contract . . . had never been made and may recover the reasonable value of services performed even though such reasonable value exceeds the contract price." *Lessing v. Gibbons*, 6 Cal. App. 2d 598, 607 (Ct. App. 1935).

[7] Assuming, *arguendo*, that the trustee could recover under a quantum meruit theory, the trustee's recovery would be limited to the reasonable value of the services and goods Sierra supplied and not the value of the house in the Cedars' hands.

U:\bdof\bd\Sierra Custom Homes Memo of Decision 5    7

construction materials. The contract amount was $435,646 plus the cost of any change orders. Because Sierra drafted the construction contract, this is evidence of a reasonable value that Sierra thought its services and materials would cost, plus, presumably some sort of profit.

The trustee presented absolutely no evidence that the value of Sierra's services or the materials it supplied in the construction of the Cedars' house in any manner exceeded the contract price. The only evidence of value that the trustee presented was the testimony of his expert Carole Laval. Laval testified that it was her opinion that as of July 2000 the Cedars' house was worth $995,000, of which $665,000 was attributed to the improvements and $330,000 was attributed to the land. However, it cannot be overemphasized that Laval's valuation was based on the erroneous assumption that the improvements were complete and suitable for occupancy and that there were no significant defects. Moreover, Laval never inspected the house in July of 2000; her only inspection of the house was on January 30, 2002. Accordingly, Laval's testimony is not very credible, and the court will not give it any weight.[8]

The trustee also argues that the parties substantially altered and "novated" the parties' contract on June 1, 2000, claiming that they put aside all their disputes and negotiated new terms and conditions of the construction contract, including a new completion date of the Cedars' residence from February 2000 until August 1, 2000. This argument is also without merit. To have a valid novation, "it is necessary that the parties intend that the rights and obligations of the new contract be substituted for the terms and conditions of the original contract. Unless this is the intent of the parties, the new contract does not constitute a novation of the old contract." *Wade v. Diamond A Cattle Co.*, 44 Cal. App. 3d 453, 457 (Ct. App. 1975). The only thing that occurred on June 1, 2000 was that the Cedars gave Larry Byrd a timeline of what needed to be done in order to have the house completed by August 1, 2000. While this might have constituted

---

[8] In addition, it should be noted that while Ms. Laval stated that she had checked comparables in arriving at the property's value, no evidence whatsoever was offered as to what comparables were used. Lacking such factors as dates of sales, differences between the subject property and the comparables, sale motivations of buyers and sellers, plus other factors that normally allow the trier of fact to evaluate the probative value of an appraiser's expert testimony, the court would have been unable to give any weight whatsoever to her testimony had value been deemed an issue.

Filed 01/27/06    Case 04-01379    Doc 101

a modification of the completion date, it did not constitute a novation of the original contract for a new contract. The timeline does not contain contract terms, there are no signatures, and there was no evidence presented that the parties intended the timeline to be a new contract substituted for the original contract.

The trustee further argues that the construction contract was changed as a matter of law because the Cedars demanded at least forty different change orders. The trustee correctly cites *C. Norman Peterson Co. v. Container Corp. of Am.*, 172 Cal. App. 3d 628, 640 (Ct. App. 1985) for the proposition that "when an owner imposes upon the contractor an excessive number of changes such that it can fairly be said that the scope of the work under the original contract has been altered, an abandonment of the contract properly may be found." In *C. Norman Peterson* there was evidence of hundreds of significant changes resulting in extra work. *Id.* at 641. For example, there were significant errors in the drawings that took 165 hours over 36 days to revise the plumbing plans and 91 hours over 21 days to revise the electrical plans. *Id.* at 636. Here, the change orders were neither as numerous nor anywhere close to the magnitude of changes in *C. Norman Peterson* and, consequently, the court declines to find or conclude that the construction contract was abandoned under this numerous change order theory.

The trustee also argues that the Cedars had an obligation under the doctrine of good faith and fair dealing to work out some reasonable arrangement over the payment problems. This argument is also without merit. The construction contract is not ambiguous, as it clearly states that the seventh payment is due "when tile is complete." The evidence indicated that the tile was approximately 70% complete in July of 2000. Accordingly, under the contract, the Cedars were not contractually obligated to pay the seventh progress payment when Sierra sent the July 12, 2000 invoice. Moreover, the contract is devoid of any terms that required the Cedars to make partial payments. The trustee has blamed the Cedars for the tile delay that put Sierra in the unfortunate position of being unable to pay its subs until the tile arrived and installation could be completed. While there was evidence of a tile delay as Gwenlee Cedar needed to order more tile, the trustee misses the critical fact that items that needed to be completed, such as cabinet

installation, before the tile could be completed. Gwenlee Cedar testified that Sierra tried to install tile before the cabinets were installed and that the tile was just hanging on the wall with no cabinets. Richard Byrd further testified that cabinets must be installed before the tile is installed if the tiling is supposed to properly abut a cabinet. The court finds that the tile delay was insignificant and that the seventh progress payment was not due. The court further finds that the contract is clear that the Cedars did not have an obligation to make partial payments or to work out some arrangement over the seventh progress payment.[9]

Lastly, the trustee argues that the Cedars breached the covenant of good faith and fair dealing by ejecting Sierra from the construction site without any warning and without an opportunity to cure. It is audacious that the trustee makes such an argument, and it simply doesn't matter that the Cedars didn't give Sierra another opportunity to cure the defects before filing the lawsuit. The evidence at trial overwhelmingly indicated that the Cedars gave Sierra numerous opportunities to cure the defects that the Cedars routinely complained about, and Sierra rarely rectified the defects. Again, the trustee's argument that the Cedars breached the covenant of good faith and fair dealing is meritless.

The Cedars' claim, which is narrower than the relief sought in state court, seeks payment from the bankruptcy estate for their expenses in making needed repairs and their costs in completing the residence. The court finds that the amount of this claim is $198,570.42. This amount was computed as follows:

////////
////////
////////
////////

---

[9] The trustee's counsel elicited some testimony from Quentin Cedar that the Cedars were not going to pay the seventh progress payment even if the tile was completed. This testimony is not very relevant for two reasons. First, the tile installation was never completed, so it will never be known what would have occurred. Second, Quentin Cedar told Richard Byrd that the Cedars were not going to pay the seventh progress payment even if the tile was complete because Sierra "was not fixing all the problems with the house; the leaky doors, the mismatched thresholds, doors that don't open and close, a roof that's incomplete, we're not paying until you finish everything, all the defects, all the problems that we've already paid you for" and Sierra continued working in light of this statement.

|  |  |
|---|---|
| $720,120.42 | This includes the $361,270.00 paid to Sierra under the contract, including change orders paid for, plus the $358,850.42 paid to, or which will need to be paid to, third parties for repairs and completion.[10] |
| - 491,550.00 | The contract price plus the additional cost of change orders. |
| $228,570.42 | The cost of completion of the residence in excess of the contract price. |
| -$30,000.00 | Received from State Center Roofing for roofing defects. |
| $198,570.42 | Amount of the Cedars' claim. |

For the reasons noted above, the trustee shall take nothing by his complaint.

The Cedars are entitled to their costs, which costs are deemed entitled to administrative expense priority.

This memorandum of decision shall constitute the court's findings of fact and conclusions of law. Separate judgments shall issue.

Dated: January 27, 2006

_____
Brett Dorian
United States Bankruptcy Judge

---

[10] The Cedars' final brief claims damages in the amount of $520,796.00. Included in this amount appears to be some $113,000.00 from two schedules attached as part of Exhibit 6 to the Cedars' first post-trial brief. The court has carefully searched the trial record and cannot find either testimony or documentary support for the $113,000. But even if the schedule containing the breakdown of the $113,000.00 had been admitted, the court would view the amounts claimed as improper or totally speculative and not supported by competent evidence.

Filed 01/27/06     Case 04-01379     Doc 101

# UNITED STATES BANKRUPTCY COURT
# EASTERN DISTRICT OF CALIFORNIA

## CERTIFICATE OF MAILING

The undersigned deputy clerk in the office of the United States Bankruptcy Court for the Eastern District of California hereby certifies that a copy of the document to which this certificate is attached was mailed today to the following entities listed at the address shown on the attached list or shown below.

| | | |
|---|---|---|
| Jeffrey L. Wall | Thomas E. Campagne | Jeffrey S. Benice |
| 6067 N Fresno St #101 | Campagne and Campagne | 650 Town Center Dr #1300 |
| Fresno CA 93710-5264 | Fresno Airport Office Center | PO Box 16579 |
| | 1685 N Helm Ave | Irvine CA 92623-6579 |
| | Fresno, CA 93727 | |

DATED: JAN 27 2006     By: *E. Halstead*
                                                   Deputy Clerk

EDC 3-070 (New 4/21/00)